LINDA J. WACHNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wachner v. Commissioner
Docket No. 6291-93
United States Tax Court
T.C. Memo 1995-88; 1995 Tax Ct. Memo LEXIS 88; 69 T.C.M. (CCH) 1982; March 2, 1995, Filed *88 Decision will be entered for respondent. For petitioner: Robert A. Jacobs. For respondent: Stephen C. Best, John Aletta, and Powell W. Holly, Jr.
WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioner's 1986 Federal income tax in the amount of $ 820,730. The issue to be decided [1] arises out of a settlement of a lawsuit concerning a failed leveraged buyout of a subsidiary of Revlon, Inc. (Revlon). We must decide whether the portion of the settlement proceeds received by petitioner during 1986 is taxable as ordinary income or is entitled to long-term capital gains treatment. Unless otherwise indicated, all section references are to the Internal Revenue Code for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. *89 FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulated facts are incorporated in our findings of fact by reference and are found accordingly. At the time the petition was filed in the instant case, petitioner resided in New York, New York. Petitioner reported her income for her taxable year 1986 on the cash receipts and disbursements method of accounting. During 1984, 1985, and part of 1986, petitioner held the position of managing director at Adler & Shaykin (A&S). A&S was a partnership formed under the laws of the State of New York. A&S' partners included Frederick R. Adler and Leonard P. Shaykin. During 1985 and 1986, Philip H. Behr, John G. Quigley, Michael R. Bruce, and John J. Murphy were also partners in A&S. Petitioner was never a partner in A&S. A&S managed a leveraged buyout fund (the Fund) on behalf of its investors. The Fund was established to acquire equity or equity equivalents in a series of leveraged acquisitions. Once A&S identified an acquisition target, it would organize a limited partnership to facilitate the Fund's investment in the target company. A&S would then contribute capital *90 to the limited partnership on behalf of the Fund's participants. Petitioner assisted A&S in negotiating and consummating leveraged buyout transactions, and consulted and advised A&S regarding any target companies in the retail or consumer products industries. On December 18, 1984, petitioner and A&S executed an agreement specifying petitioner's responsibilities with regard to A&S' leveraged buyout activities and petitioner's compensation. The December 18, 1984, agreement, in pertinent part, provides: 1. A&S hereby agrees to employ you as Managing Director, Consumer Products for a period beginning on December 18, 1984 and ending on November 30, 1985 (the "Term"). 2. During the Term, A&S will pay you $ 10,000 at the beginning of each month * * * and will, in addition, reimburse you, upon presentation of receipts, for reasonable out-of-pocket business expenses of up to $ 2,000 per month incurred in connection with your performance of duties hereunder. It is contemplated that A&S will be reimbursed for all amounts paid to you hereunder as part of the closing costs of any leveraged buyout or other transaction that you will have brought to the attention of A&S or for which you *91 will have provided substantial consulting services (if such a transaction is ultimately closed). * * * 5. a. For target companies in the retail and/or consumer products industry that A&S invests in and that you brought to the attention of A&S or for which you provided substantial consulting services, A&S will provide you with the following additional compensation: (i) If you are appointed chief executive officer of the target company and you are expected to devote more than 20% of your business time to the affairs of the target company, you will receive one-fourth of A&S's closing fee for consummating the transaction and you and your management group will have the right to buy no less than 20-30% of the target company, as determined in the discretion of A&S. Your right to buy a portion of the target company shall be on substantially the same terms as those at which A&S is purchasing target company stock, except that you and your management group may pay a portion of the consideration for such stock with notes as reasonably determined by A&S. (ii) If you are not appointed chief executive officer of the target company (or if you are appointed chief executive officer but *92 are not expected to devote more than 20% of your business time to the affairs of the target company), you will receive one-half of A&S's closing fee for consummating the transaction and will have the right to buy 10% of the Co-Investment, as defined in the Commitment Agreement dated October 3, 1983. Your right to buy a portion of the Co-Investment shall be on substantially the same terms as those at which A&S is purchasing target company stock. b. For target companies not in the retail and/or consumer products industry in which A&S invests during the Term, you will be made aware of all such target companies and have the right to purchase up to 5%, as determined in your discretion, of the Co-Investment. Your right to buy a portion of the Co-Investment shall be on substantially the same terms as those of A&S. 6. A&S further agrees that, during the Term, you will be entitled to receive medical insurance benefits customarily accorded to employees of A&S of like stature. 7. The parties to this Agreement will review their relationship and the terms of this Agreement beginning in September 1985. During 1985, A&S paid $ 120,000 to petitioner, which A&S reported on Form 1099-MISC. *93 During 1986, A&S paid $ 55,000 to petitioner, which A&S reported on Form 1099-MISC. Petitioner identified Revlon's Beauty and Fragrance Division (the RBFD) as a suitable acquisition target and brought it to the attention of A&S. Petitioner, on behalf of A&S, negotiated the purchase price for the RBFD, the outside financing for the transaction, and the asset purchase agreement with Revlon. Petitioner, on behalf of A&S, also developed cash flow projections, balance sheets, inventory, debt and account receivables schedules, and performed a due diligence investigation, which included analyzing legal contracts, visiting plants and operations, and interviewing employees of the RBFD. If the purchase and sale of the RBFD had closed, the amount of A&S' closing fee that petitioner would have received under the December 18, 1984, agreement would have been compensation for services. On October 1, 1985, to facilitate the purchase of the RBFD, A&S organized a Delaware corporation, Beauty Acquisition Corp. (BAC). [2]BAC's certificate of incorporation named Mr. Shaykin as BAC's sole director. On October 1, 1985, Mr. Shaykin, as BAC's sole director, elected the following officers of BAC: Mr. *94 Shaykin, president; petitioner, vice president/treasurer; Mr. Quigley, vice president/secretary; and Mr. Kevin R. Evanich, vice president/assistant secretary. The equity financing for the purchase of the RBFD was to be provided by the following parties: The Equitable Life Assurance Co. (Equitable); Outside Investors/Directors; Revlon Partners; [3] A&S' partners; and BAC's management team, which included petitioner. On October 2, 1985, Equitable executed a letter confirming that, subject to certain conditions, it would provide BAC with $ 375 million in debt financing and $ 34,500,000 in equity financing in order to facilitate BAC's purchase of the RBFD. [4] On October 2, 1985, Bankers Trust Co. (Bankers Trust) and Manufacturers Hanover Trust Co. (Manufacturers Hanover) issued a letter to A&S confirming their willingness to provide credit in the aggregate amount of $ 495 million to finance BAC's purchase of the RBFD. On October 3, 1985, A&S issued a letter in which it unconditionally committed *95 to purchase 55 percent, approximately $ 42 million, of the $ 76,670,000 of equity securities to be issued by BAC. An outline of BAC's equity financing arrangements prepared by Mr. Quigley, dated December 20, 1985, is attached as the appendix. [5]
On October 3, 1985, Revlon entered into an asset purchase agreement (the RBFD contract) with BAC for the sale of the RBFD to BAC. A&S negotiated *96 and obtained for BAC a right to specific performance if Revlon failed to perform under the terms of the RBFD contract. Section 8.16 of the contract provides: Right to Specific Performance. The parties agree that the assets of the * * * [RBFD] are unique and that Buyer is entitled to specific performance of this Agreement. In consideration of the execution of this Agreement by Buyer, Seller agrees that, if a court refuses to grant Buyer specific performance of this Agreement against Seller, Seller will promptly deliver to Buyer $ 20 million in immediately available funds as a break-up fee. Buyer's right to receive payments pursuant to section 8.16 is in addition to, and not in lieu or derogation of, Buyer's right to seek specific performance under this Agreement. The RBFD contract was signed by Mr. Shaykin as president of BAC. The RBFD contract contained a provision in which A&S guaranteed the performance of BAC under the contract. Mr. Shaykin signed the guarantee as a general partner in A&S. Petitioner did not sign the contract or the guarantee. On October 9, 1985, A&S issued Communication #21 to its investors, which in pertinent part, states: Pursuant to section *97 3.01 (a) of the Commitment Agreement for the Adler & Shaykin Fund, you are hereby notified of Adler & Shaykin's upcoming investment. On or about November 15, 1985, Adler & Shaykin will fund an investment in connection with the acquisition of Revlon, Inc.'s Beauty Products Group. * * * The estimated aggregate investment by the Adler & Shaykin Fund will be $ 20 million or 20% of each limited partner's total commitment. In addition, the general partners of Adler & Shaykin, pursuant to section 1.01 (c) of the Commitment Agreement, will be investing $ 5 million, making the total investment by Adler & Shaykin $ 25 million (the maximum investment). On or about October 31, 1985, we will notify you of the type and amounts of securities comprising this investment, the exact date of the closing, and payment instructions for the funding of this investment. * * * This investment will be funded by the new A&S Holding Partnership (Revlon Partners), which is being established pursuant to Section 3.02 of the Commitment Agreement. * * * On November 5, 1985, Pantry Pride, Inc. (Pantry Pride), acquired Revlon. On November 19, 1985, BAC filed a lawsuit against Revlon in the Delaware Chancery *98 Court. In its complaint, BAC sought specific performance of the RBFD contract. The complaint alleged that after Pantry Pride gained control of Revlon on November 5, 1985, Revlon breached the RBFD contract by taking actions which BAC believed were designed to prevent it from consummating the purchase of the RBFD. On November 21, 1985, BAC issued 100 shares of common stock to A&S as record owner. That same day, Mr. Shaykin, as BAC's sole director, elected the following officers of BAC: Petitioner, chief executive officer; Leonard P. Shaykin, president; and John G. Quigley, secretary/treasurer. Mr. Shaykin, as BAC's sole director, also adopted a resolution naming petitioner as the chairman of BAC's board of directors and naming Frederick R. Adler to BAC's board of directors. On December 6, 1985, petitioner sent a memorandum to Mr. Adler concerning her employment by A&S. In her memorandum, petitioner states: Attached are a series of documents starting prior to October 18 on BAC. Also attached is a copy of my Adler & Shaykin agreement which ended on November 30, 1985. The open issues are: 1. The break-up fee and/or damages which we might obtain in BAC. 2. The BAC Agreement *99 - term sheets relating to my agreement with BAC along with two pages that you dictated prior to your vacation. 3. My continuing agreement with Adler & Shaykin. 4. An open issue is still my personal indemnification in any litigation that might arise with respect to Pantry Pride. I only wish to be fair and just on any of these matters. I am appreciative of your time, and hope we can finalize these this Sunday. A handwritten note beneath the typed portion of petitioner's memorandum indicates that 25 percent of A&S' portion of the "break-up fee", less expenses, would be paid to "L.W." On December 12, 1985, petitioner and A&S entered into a letter agreement. The December 12, 1985, letter agreement provides: Your contract ends November 30, 1985. This is to confirm our understanding as follows: 1) On the assumption that the BAC acquisition goes through, you will continue as a principal of Adler & Shaykin at a compensation of $ 5,000 per month at an at will basis that is terminable at any time. It would be our intention and your intention that we continue to work closely and develop additional situations for investment as well as for you to be involved in questions involving *100 open market investments, our present portfolio; etc.; and 2) Until such time as the BAC acquisition consummates or if it fails, you will continue as a principal of Adler & Shaykin at your present compensation of $ 10,000 per month plus normal out of pocket expenses up to $ 2,000.00 per month, unless terminated by either you or by us on not less than ninety days' notice. For this interim period, your rights to fees and co-investment opportunities of Adler & Shaykin shall be at the discretion of Adler & Shaykin. It is understood, however, that if the BAC acquisition does not close, both of us intend to arrive at a more defined agreement. 3) The amount received from any break-up fee or settlement of the Revlon matter shall be as follows: a) First shall be deducted all expenses, not otherwise compensated for, of the Revlon transaction, including fees for accountants, lawyers, consultants, other expenses provided for by the December 18, 1984 agreement, litigation expenses, any other cost of any nature whatsoever. b) Then shall be deducted any amounts due to the Banks and Equitable. c) Then of the first gross $ 20,000,000 breakup fee or settlement paid, you shall be entitled *101 to 25% of the net profits before allocation to limited partners. d) Then of amounts in excess of such gross $ 20,000,000, you shall be entitled to 15% of the net profits computed after deduction for a) and b) and after any payments made to limited partners. 4) If the BAC acquisition goes through, in addition to the provisions in Paragraph 1), your rights shall be governed by the separate agreement, attached as Exhibit A, and you shall also be paid 25% of the Adler & Shaykin General Partner portion of the closing payment which is currently estimated at $ 8,000,000 (i.e., 25% of $ 8,000,000). The letter agreement was signed by petitioner on December 20, 1985. On December 16, 1985, petitioner signed another letter agreement with A&S concerning her equity participation and employment by BAC. The December 16, 1985, letter agreement, in pertinent part, provides: This letter confirms our understanding and, when signed, our agreement concerning your equity participation in and employment by Beauty Acquisition Corporation ("BAC"). I. Wachner's Stock
A. Payment. (1) At the Closing, Wachner will pay BAC $ 1 million in cash and will deliver to BAC a note for $ 2.75 million *102 (the "Note") for her 5% of BAC's common and preferred stock. * * * B. Vesting. 40% of Wachner's BAC common and preferred stock will fully vest at the Closing. Vesting on the remaining 60% will be determined under a time vesting schedule and a performance vesting schedule, both of which must be satisfied in order for stock to fully vest. (i) Time vesting. Stock will time vest during the period that Wachner is employed by BAC with 20% of Wachner's BAC stock time vesting during the first year following the Closing and 10% vesting in each of the next four years, on a daily pro rata basis. (ii) Performance vesting. Stock which has time vested will performance vest if both the annual debt reduction and operating profit goals are met. * * * (iii) Example. If, for example, Wachner's employment terminates on June 30, 1986, one-half of the 20% for 1986 will be time vested. If both the 1986 performance goals are met (based on BAC's debt reduction and operating profit for 1986), 10% of the stock will vest. (iv) Cumulative vesting. If for any year both of such year's annual performance goals are not achieved so that some stock has time *103 vested but not performance vested, such partially vested stock will thereafter performance vest (i.e., become fully vested) only if for any subsequent year both the cumulative debt reduction and operating profit goals are met and Wachner is employed on the last day of such year: * * * (v) Addition Vesting. On Wachner's death, permanent disability or termination without cause, 50% of the BAC stock which has not yet time vested will fully vest. * * * D. Repurchase Rights. Upon the termination of Wachner's employment agreement for any reason (including death), BAC will have the right to purchase (i) Wachner's unvested stock for cost plus 10% simple interest accruing from the Closing through the repurchase date and (ii) Wachner's vested stock for the fair market value as determined in good faith by BAC's board, except that if Wachner disagrees with the board's determination, an independent investment banker employed by or a partner of a member firm of the New York Stock Exchange and selected by BAC will determine such stock's fair market value. After BAC financial statements for the year ended 12/31/90 have become available, if any of Wachner's *104 stock has not fully vested, BAC will have the right to purchase such unvested stock for cost plus 10% simple interest accruing from the Closing through the repurchase date. II. Wachner's Employment Agreement
A. Position. Wachner will be employed for the term of this agreement as BAC's Chief Executive Officer with the title of either Chairman or President, or both, as the board from time to time may designate. B. Term. The agreement will have a five year term, provided that if Wachner is employed on the fourth anniversary of the Closing, or any subsequent anniversary through the eighth anniversary, then the agreement's term in each such case will be extended by an additional year, e.g., if Wachner is employed on the fifth anniversary, the agreement will have a seven year term. C. Base Compensation. $ 500,000 per year; provided that the board, in its absolute discretion and without obligation, will review her base compensation and bonus structure every year, beginning at the end of two full years of employment. D. Bonus. $ 125,000 in each year in which BAC achieves the following operating profit goal, and $ 125,000 in each year in which BAC achieves *105 the following debt reduction goal: * * * If Wachner is terminated without cause, BAC's board, in its absolute discretion and without obligation, will determine whether she is entitled to a bonus for such year. Upon her termination for any other reason, Wachner will not receive a bonus. E. Addition Bonus. If annual operating profits * * * for the second year or any subsequent year exceed $ 150 million, Wachner will receive a cash bonus equal to 1% of such year's operating profits over $ 150 million until operating profits reach $ 200 million and 1-1/2% of the operating profits over $ 200 million; provided, however, that the required operating profits shall be adjusted upwards proportionately to the extent that the CPI increases in excess of .75 of 1% per quarter or 3% per year. If Wachner is terminated without cause, BAC's board will, in its absolute discretion and without obligation, determine whether she is entitled to a bonus for such year. Upon her termination for any other reason, Wachner will not receive a bonus. * * * G. Covenant Not to Compete. If Wachner quits, or is terminated with cause, she will not be employed or affiliated, for a period of eighteen *106 months, with any company engaged in any business in which, at the time of her departure, BAC was either engaged or contemplated being engaged. H. Business Time. For the term of the agreement, Wachner will devote substantially all of her business time to BAC, provided that she may devote up to 10% of her business time to other matters for Adler & Shaykin, in which she serves as a principal, plus such other time, as from time to time, may be approved by the BAC board for services on other boards of directors. * * * K. Legal Expenses. BAC will pay Wachner's legal expenses for an amount up to $ 10,000, in connection with the transactions contemplated hereby, whether or not consummated. * * * This letter outlines the terms of agreements which will eventually be embodied in definitive agreements. However, until definitive agreements can be prepared, this letter agreement will be binding upon both parties hereto. Part II (K) above will be effective whether or not BAC acquires Revlon. The remainder of this agreement will be effective only if BAC acquires Revlon. [Fn. ref. omitted.] A management agreement, dated December 24, 1985, was prepared, but was not executed *107 by either BAC or petitioner. [6] The management agreement embodies the terms of the December 16, 1985, agreement executed by petitioner and A&S. Manufacturers Hanover agreed to lend petitioner $ 1 million to enable her to pay the cash portion of her BAC stock subscription. Petitioner signed a demand note and general loan and security agreement with Manufacturers Hanover on December 24, 1985. Petitioner, however, did not receive a loan from Manufacturers Hanover, did not invest in BAC, and never delivered a note to BAC for the purchase of any stock in BAC. On December 30, 1985, A&S issued a memorandum to the partners in Revlon Partners concerning BAC's failure to close the RBFD purchase. The memorandum states: The purchase of Revlon's Beauty Group did not close on December 26, 1985 as previously announced because the Seller did not perform in accordance with the terms and *108 conditions of the contract they have with us. We intend to pursue the matter vigorously, and will keep you informed, as best we can, of future developments. We are, however, refunding your investment, with interest, in Revlon Partners at this time. We will inform you of a revised closing schedule as the matter progresses. On April 2, 1986, A&S issued a memorandum to the partners in Revlon Partners concerning the distribution of interest that had accrued on each partner's capital contribution to Revlon Partners. On June 23, 1986, petitioner sent a letter to Mr. Shaykin concerning her agreement with A&S. The letter, in pertinent part, states: As you know, we have an interim agreement, spanning the time from the end of my actual agreement until the settlement of Revlon. When we had dinner last month, you indicated that you wanted to do an entirely new agreement with me. Leonard, although I sincerely appreciate your thoughtfulness, it seems that my time is very much allocated to the operating responsibility at Warnaco. Therefore, I think that after we settle the Revlon situation as spelled out in my Agreement Letter, signed by Fred, we should conclude my existing arrangement *109 with Adler and Shaykin. On July 10, 1986, BAC adopted a plan of liquidation. On September 29, 1986, Mr. Shaykin, as president of BAC, executed a document entitled "Transfer and Assignment of Assets", in which BAC transferred its only asset, its claim against Revlon for breach of the RBFD contract, to the holders in interest of BAC in exchange for the 100 shares of BAC's common stock. On October 2, 1986, BAC formally dissolved. On October 3, 1986, a certificate of dissolution was filed on behalf of BAC with the Office of the Secretary of State of Delaware. On October 27, 1986, Revlon paid $ 21,300,000 as a partial settlement of the Beauty Acquisition Corp. v. Revlon, Inc., No. 8253 (Del. Ch., Dec. 12, 1985), lawsuit to Equitable, Bankers Trust, and Manufacturers Hanover in exchange for the release of their claims against Revlon arising out of the litigation concerning the RBFD contract. On December 2, 1986, A&S, as the agent for the holders in interest in BAC, executed a settlement agreement with Revlon that required Revlon to pay $ 23,700,000 to A&S to settle the litigation with Revlon over the RBFD contract. On December 2, 1986, Mr. Shaykin sent a memorandum to Mr. Adler *110 discussing the amount to be paid to petitioner as her share of the settlement proceeds from the Beauty Acquisition Corp. v. Revlon, Inc., supra, lawsuit. The memorandum, in pertinent part, states: 2. Attached is a copy of the indemnification agreement between ourselves and Linda. Knowing Linda, she will want to have her lawyer review this, and she will only be willing to sign it, I would imagine, after you and she discuss in detail the computation and characterization of her distribution. With respect to the amount which she should receive, I would propose that the following simple explanation be given to her: We first take the gross amount ($ 23.7 million) and subtract from it all of our out-of-pocket third party fees and expenses (i.e. lawyers, accountants, public relations people etc.). We then subtract all of our outside third party payments to people who assisted us in this transaction (i.e. Shearson, AMA, and various equity individuals). That will leave a remainder which will be in the neighborhood of $ 18 million. From that amount, we then subtract $ 7 million (representing our collective portion of the first tranche of $ 20 million). Linda gets *111 25% of this first $ 7 million or $ 1.750 million. That leaves the remainder of $ 11 million. We then divide the $ 11 million - 40% to our limited partners and 60% to ourselves and Linda. Per our letter agreement with her, Linda would receive 15% of our 60%, or 9% of the total remainder. If the amount of the remainder is $ 11 million, Linda would then get $ 990,000 of this second tranche. In sum, Linda would get 25% of the first $ 7 million ($ 1.75 million) and 9% of the remainder (approximately $ 1 million if the remainder is $ 11 million or so). Thus her total would be roughly $ 2.75 million. Linda, along with us, will be entitled to take capital gains treatment on her distribution and will, like us, be responsible for signing a tax indemnification agreement. Linda will also be responsible for repaying to us the $ 50,000 advance which we made to her towards the end of 1985 without interest. On December 5, 1986, petitioner and A&S executed a letter agreement, which in pertinent part, provides: A. In consideration of the payment to Wachner of $ 2,785,000 by A&S, receipt of which is hereby acknowledged, Wachner hereby releases and discharges A&S and the former holders *112 of interests in BAC * * * from all actions, causes of action, debts, demands and claims * * * with respect to the Asset Purchase Agreement, the [December 12, 1985] Letter Agreement and the transactions contemplated thereby * * * which Wachner ever had, now has or hereafter may have against [A&S and the former holders of interests in BAC] * * *. B. Notwithstanding the foregoing, Wachner, on the one hand, and the A&S Group (comprised of A&S and partners therein, Revlon Partners, a New York limited partnership, and partners therein, and others who receive amounts through A&S other than Wachner), on the other hand, shall share * * * any Federal, state or local tax, including interest and penalties, and the reasonable expenses of contesting any such tax (the "Tax") incurred by, or assessed against, BAC * * * which is attributable to the Settlement Amount and which is not paid by the Equitable Group pursuant to the Equitable Agreement. On December 17, 1986, A&S issued a check to petitioner in the amount of $ 2,785,000 (the settlement payment) from the proceeds it received pursuant to the settlement agreement with Revlon. The settlement payment was made pursuant to paragraph 3 of the *113 December 12, 1985, letter agreement executed by A&S and petitioner. A&S sent a memorandum, dated December 17, 1986, to the limited partners of Revlon Partners discussing the amount of the settlement proceeds A&S proposed to distribute to them. The memorandum, in relevant part, states: The result of approximately one year of effort and in excess of $ 3.5 million in gross litigation expenses, is that, in early November, our banks received $ 6,000,000 as a settlement from Revlon and Equitable received $ 15,300,000, less its direct expenses. On December 2, 1986, A&S settled separately with Revlon for $ 23,700,000. After all third party expenses, including contractual payments to Linda Wachner, and payments to key A&S personnel who worked on the matter, the net settlement came to approximately $ 13,800,000. * * * Trying to balance all of this and be more than fair to all parties concerned, we have decided to pay $ 4,600,000 to the Limited Partners and $ 4,600,000 to L. P. Shaykin and $ 4,600,000 to F. R. Adler. * * * Subsequently, a dispute arose between A&S and some of the limited partners of Revlon Partners regarding the amount of the settlement proceeds to be distributed *114 to the limited partners. A&S distributed $ 2,783,000 to those limited partners who accepted the $ 4,600,000 as the limited partners' share of the settlement proceeds. The remaining limited partners formed an investment committee to dispute the amount of the settlement proceeds that A&S proposed to pay to the limited partners. On April 23, 1987, A&S and the investors' committee reached a settlement whereby A&S agreed to pay all the limited partners an aggregate amount of $ 9,937,500 as their share of the settlement proceeds from the Beauty Acquisition Corp. v. Revlon, Inc., supra, lawsuit. On May 7, 1987, A&S, for itself and the former holders of interest in BAC, entered into tax indemnification agreements with its investors. On May 15, 1987, A&S sent a letter to petitioner requesting that she return $ 810,375 of the settlement payment. In the letter, A&S states the following: On December 12, 1985 Linda Wachner ("Wachner") and Adler & Shaykin ("A&S") entered into a letter agreement (the "1985 Letter") pursuant to which A&S agreed to pay to Wachner a specified portion of the net amount retained by A&S (after payment of expenses and payments to its limited partners) *115 out of the amount received by A&S in connection with claims against Revlon, Inc. and its affiliates (collectively "Revlon"). On December 5, 1986, Wachner and A&S entered into a letter agreement (the "1986 Letter") pursuant to which A&S delivered to Wachner $ 2,785,000 in payment of amount due to Wachner under the 1985 Letter. The amount paid to Wachner under the 1986 Letter was based upon A&S' belief that $ 4,600,000 of the amount received by A&S from Revlon would be paid to A&S' limited partners. Subsequent to the 1986 Letter, a dispute arose between A&S and its limited partners, resulting in the amount paid by A&S to the limited partners being increased from $ 4,600,000 to $ 9,937,500. As a result, the net amount retained by A&S out of the Revlon settlement decreased and the parties hereto agree that the amount paid to Wachner will be decreased to $ 1,974,625. To effectuate such decrease, Wachner will repay to A&S $ 810,375 by May 22, 1987. As a result of Wachner's repayment to A&S, Wachner will be deemed to have received the net amount of $ 1,974,625 from A&S pursuant to the 1986 Letter. Except as expressly set forth herein, the 1986 Letter will remain in full force and *116 effect (including but not limited to the release and tax indemnification provision thereof). The parties acknowledge that Wachner's liability in respect of the tax indemnity set forth in the 1986 Letter will be reduced in proportion to the reduced percentage of the Settlement Amount (as defined in the 1986 Letter) received by Wachner. In particular, the portion of the Settlement Amount received by Wachner will be deemed to be $ 1,974,625, rather than $ 2,785,000. On June 17, 1987, A&S sent another letter to petitioner, which states: As already discussed with you, pursuant to the understanding of the parties, should the Revlon transaction not close, you were to receive the following payment from any resulting break-up fee or settlement: $ 1,750,000, representing 25% of our share of the first gross $ 20,000,000 break-up fee before allocation to the limited partners; and an additional 15% of the general partner's share of the proceeds after payment of out-of-pocket and third party expenses and payments to Adler & Shaykin's limited partners. As you are aware, the Revlon transaction did not close and litigation ensued. Initially, at the time of settlement, in December 1986, *117 all parties anticipated payments to our limited partners of $ 4.6 million. In order that you promptly receive your share of the proceeds upon the settlement of the Revlon litigation, we paid you $ 2,785,000 based on that $ 4.6 million figure. At that time it was explained to you that the payment which you received was based on an estimate of your entitlement and you would have to return an allocable portion if payments to the limited partners turned out to be greater than contemplated. Subsequently, on April 23, 1987, pursuant to our agreement with the limited partners, it was determined that the limited partners were entitled to a final distribution of $ 9,937,500 from the proceeds of the Revlon settlement. Accordingly, in our letter of May 15, 1987, we notified you that payments to the limited partners exceeded our original estimate, and requested, per our prior understanding, that you return to us $ 810,375, which figure represents the decrease in your share of the Revlon settlement based on the final distribution to our limited partners. Despite our requests, you have not repaid this money We have discussed this matter with our counsel, Dennis J. Block of Weil, Gotshal *118 & Manges, and must now insist that you forthwith remit to us the $ 810,375 owed pursuant to our understanding. If you continue to refuse to abide by your agreements, we will be forced to authorize Mr. Block to take all action necessary to obtain payment. We trust this action will not be necessary. On or about August 10, 1987, A&S brought a lawsuit against petitioner in the Supreme Court of the State of New York seeking a refund from petitioner of $ 810,375 of the settlement payment. The suit was removed to the U.S. District Court for the Southern District of New York. On August 24, 1987, A&S paid the Revlon Partners limited partners $ 9,937,000. Petitioner reported the settlement payment as long-term capital gains, with a basis of zero, on her Federal income tax return for her taxable year 1986. OPINION We are asked to decide whether the settlement payment is taxable as ordinary income or is entitled to long-term capital gains treatment. Petitioner argues that her contractual right to purchase stock in BAC is a capital asset, that the settlement payment was in exchange for her equitable interest in BAC and that she is therefore entitled to long-term capital gains treatment. *119 Respondent, on the other hand, contends that petitioner never had an equity interest in BAC, that the settlement payment was compensation for services she performed in connection with the RBFD transaction, and that the settlement payment is taxable as ordinary income. [7]Respondent's determination is presumed correct, and petitioner bears the burden of proving that the determination is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). An executory contract to acquire a capital asset may itself be a capital asset. Turzillo v. Commissioner, 346 F.2d 884 (6th Cir. 1965), revg. and remanding T.C. Memo. 1963-317; Dorman v. United States, 296 F.2d 27 (9th Cir. 1961); Meldon v. Commissioner, 225 F.2d 467 (3d Cir. 1955), *120 affg. in part and vacating in part T.C. Memo. 1954-120; Denison v. Commissioner, T.C. Memo. 1977-430. The release of a contractual right to acquire a capital asset may constitute a sale or exchange of a capital asset. Commissioner v. Ferrer, 304 F.2d 125 (2d Cir. 1962), revg. in part and remanding 35 T.C. 617 (1961). On the other hand, an amount received as a substitute for ordinary income is taxable as ordinary income even though a property right has technically been transferred. See Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958); Hort v. Commissioner, 313 U.S. 28 (1941); United States v. Dresser Indus., Inc., 324 F.2d 56, 59 (5th Cir. 1963); Wiseman v. Halliburton Oil Well Cementing Co., 301 F.2d 654, 658 (10th Cir. 1962); Foy v. Commissioner, 84 T.C. 50, 68 (1985). [8] For instance, contracts for personal services are not considered capital assets in the hands of the person who is to render the services *121 even though they may be considered "property" for purposes of State law. See Commissioner v. Gillette Motor Transp., Inc., 364 U.S. 130, 135 (1960); Burnet v. Harmel, 287 U.S. 103, 110 (1932); Freese v. United States, 455 F.2d 1146 (10th Cir. 1972); Shuster v. Helvering, 121 F.2d 643, 645 (2d Cir. 1941), affg. 42 B.T.A. 255 (1940); Rothstein v. Commissioner, 90 T.C. 488, 494 (1988); Kingsbury v. Commissioner, 65 T.C. 1068, 1081 (1976); Putchat v. Commissioner, 52 T.C. 470 (1969), affd. 425 F.2d 737 (3d Cir. 1970). Consequently, in the instant case, petitioner must prove that she received the settlement payment (or a portion thereof) in exchange for her right to purchase an equity interest in BAC. Otherwise, we must sustain respondent's determination that the settlement payment was for personal services performed by petitioner in connection with BAC's failed attempt to acquire the RBFD, and is taxable as ordinary *122 income. Freese v. United States, supra; Rothstein v. Commissioner, supra at 493; see also Elliott v. United States, 431 F.2d 1149 (10th Cir. 1970). The question of whether the settlement payment represents fruits of labor or fruits of a sale or exchange of a capital asset is a question of fact. Foy v. Commissioner, supra at 69-70; Buena Vista Farms, Inc. v. Commissioner, 68 T.C. 405, 411-412 (1977); Denison v. Commissioner, supra.
Respondent contends that the documentary evidence establishes that petitioner received the settlement payment as compensation for services. Petitioner contends that the testimony *123 establishes that the settlement payment was received in exchange for her equity interest in BAC. We hold that petitioner has failed to prove that the settlement payment was received in exchange for her equity interest in BAC. On December 18, 1984, petitioner signed a letter agreement with A&S in which A&S agreed to pay petitioner $ 10,000 per month and to reimburse her up to $ 2,000 a month for out-of-pocket expenses. The letter agreement provided that, if petitioner identified a company in the retail or consumer products industries leading to A&S' decision to invest in the company and if she provided substantial consulting services, petitioner would be entitled to additional compensation upon her devotion of more than 20 percent of her business time to operating the target corporation. The additional compensation was to be one-fourth of A&S' closing fee for consummating the transaction and an option to purchase 20 to 30 percent of the target company on substantially the same terms as A&S. The letter agreement also stated that petitioner was entitled to receive medical insurance benefits "customarily accorded to employees of A&S of like stature". Petitioner identified the RBFD *124 as a suitable investment for A&S and brought it to A&S' attention as an acquisition target. On behalf of A&S, petitioner negotiated the purchase price for the RBFD, the RBFD contract, and the outside financing for the transaction, and performed other services that were necessary to facilitate the transaction. After it became likely that the RBFD transaction would not close as scheduled, petitioner, on December 6, 1985, sent a memorandum to Mr. Adler concerning her status with A&S. [9] In her memorandum, petitioner expressed a desire to come to a resolution with A&S over what percentage of any breakup fee or settlement that BAC might obtain from Revlon would be allocated to her. Petitioner and Mr. Adler agreed on a formula for allocating the proceeds from the RBFD litigation to petitioner. [10] The agreement they reached concerning the allocation of the settlement proceeds was included in the December 12, 1985, letter agreement executed by petitioner and A&S. Both respondent and petitioner agree that the settlement payment was made pursuant to paragraph 3 of the December 12, 1985, letter agreement. Paragraph 3 provides: 3) The amount to be received from any breakup fee or settlement *125 of the Revlon matter shall be as follows: a) First shall be deducted all expenses, not otherwise compensated for, of the Revlon transaction, including fees for accountants, lawyers, consultants, other expenses provided for by the December 18, 1984 agreement, litigation expenses, any other cost of any nature whatsoever. b) Then shall be deducted any amounts due to the Banks and Equitable. c) Then of the first gross $ 20,000,000 breakup fee or settlement paid, you shall be entitled to 25% of the net profits before allocation to limited partners. d) Then of amounts in excess of such gross $ 20,000,000, you shall be entitled to 15% of the net profits computed after deduction for a) and b) and after any payments made to limited partners. At trial, Mr. Adler, Mr. *126 Shaykin, and Mr. Quigley testified that they regarded petitioner as a "partner" or "coventurer" in the RBFD transaction, and that the settlement payment was not compensation for the services that she performed in connection with the RBFD transaction. Mr. Shaykin, Mr. Adler, and petitioner also testified that the settlement payment was made in exchange for petitioner's equity interest in BAC. Some of the documentary evidence in the record tends to support the proposition that at least some portion of the settlement payment was made in exchange for an equity interest in BAC. Mr. Shaykin's memorandum, dated December 2, 1986, concerning the amount of the settlement proceeds that was to be allocated to petitioner, states that petitioner, like the partners in A&S, would be entitled to capital gains treatment. While such a statement is by no means dispositive of the question of whether the settlement payment is taxable as a capital gain, it does corroborate Mr. Shaykin's testimony that petitioner was regarded as an equity investor in the RBFD transaction and that she had the same status as the other equity investors. Petitioner's contention also finds some support in the "final breakdown *127 of Revlon expenses and allocations" prepared by A&S on September 22, 1987, which lists the settlement payment on the same schedule as the payments that were made to the partners of A&S on account of their equity interests in BAC. Nevertheless, other documents in the record tend to support the proposition that the settlement payment was received by petitioner as compensation for services that she performed in connection with the RBFD transaction. A&S' December 17, 1986, memorandum to the limited partners of Revlon partners states, in part: On December 2, 1986, A&S settled separately with Revlon for $ 23,700,000. After all third party expenses, including contractual payments to Linda Wachner, and payments to key A&S personnel who worked on the matter, the net settlement came to approximately $ 13,800,000. A&S' characterization of the contractual payments it made to petitioner as "third party expenses" -- in the same category as "key A&S personnel who worked on the matter" -- suggests that A&S intended to compensate petitioner for services rendered in connection with the RBFD transaction, rather than for petitioner's equity participation in the RBFD transaction. Moreover, the *128 "final breakdown of Revlon expenses and allocations" prepared by A&S on September 22, 1987, also lists the settlement payment made to petitioner in the same category as "net expenses" [11] and payments made to "third parties". [12]
Finally, paragraph 3 of the December 12, 1985, letter agreement and Mr. Shaykin's memorandum to Mr. Adler, dated December 2, 1986, *129 states that any payment made to petitioner was to be reduced by the amount of the out-of-pocket expenses A&S advanced to petitioner during 1985. [13] The requirement that petitioner "reimburse" A&S for the out-of-pocket expenses A&S advanced to her during the course of the RBFD transaction supports respondent's contention that petitioner was receiving a commission for arranging the RBFD transaction. [14]
Petitioner bears the burden of proving that she received the entire settlement payment in exchange for her equity interest in BAC. At trial, petitioner testified that *130 she was the one who brought the RBFD transaction to the attention of A&S. She also testified at length about the extensive services she performed in connection with the RBFD transaction, yet she contends that the only compensation she received for those services was the $ 10,000 per month retainer fee A&S paid her. Petitioner concedes that, if BAC had acquired the RBFD, she would have been entitled to a $ 2 million payment (25 percent of the A&S' projected $ 8 million closing fee) as compensation for services she performed in connection with the RBFD transaction. None of the documentary evidence contained in the record is conclusive as to the issue of whether the settlement payment was made to compensate petitioner for the loss of a right to acquire an equity interest in BAC. Moreover, neither the testimony presented at trial nor the documentary evidence in the record establishes a clear connection between the formula contained in paragraph 3 of the December 12, 1985, letter agreement and any equity interest petitioner might have acquired in BAC if the Revlon acquisition had gone through. Consequently, we hold that petitioner has failed to meet her burden of proving that she *131 received the settlement payment, or any portion of it, in exchange for the loss of a right to acquire an equity interest in BAC. Additionally, even if petitioner had received the settlement payment in exchange for an equity interest in BAC, such an interest would have been received by petitioner in connection with her performance of services. Section 83 governs the taxation of property transferred to a person "in connection with the performance of services". Section 83(a) provides that, where property is transferred in connection with the performance of services, the excess of the fair market value of the property over the amount paid for the property, if any, is includable in the gross income of the taxpayer who performed the services. [15] A transfer of property is subject to section 83 if made "in respect of past, present, or future services". Sec. 1.83-3(f), Income Tax Regs. Whether property was transferred in connection with the performance of services is a question of fact. Bagley v. Commissioner, 85 T.C. 663, 669 (1985), affd. 806 F.2d 169 (8th Cir. 1986). Where the transfer of property is governed by the terms *132 of an employment agreement, we have generally found that the taxpayer received the property in connection with the performance of services. Id. at 669; Alves v. Commissioner, 79 T.C. 864 (1982) (Court-reviewed), affd. 734 F.2d 478 (9th Cir. 1984); see also Puchat v. Commissioner, 52 T.C. 470 (1969), affd. 425 F.2d 737 (3d Cir. 1970) (holding that an amount received by a taxpayer in exchange for the release of all his rights under an employment agreement, which included the release of his right to exercise a stock option, was compensatory in nature, and was therefore taxable as ordinary income).
In the instant case, the documents in the record *133 clearly demonstrate that petitioner's right to invest in any of A&S' ventures involving companies in the retail or consumer products industries was contingent on her performing services on behalf of either A&S or the acquisition target. Moreover, in the December 16, 1985, letter agreement executed by both petitioner and A&S, petitioner's right to purchase a 5-percent equity interest in BAC was made contingent on her performing services for BAC. According to the December 16, 1985, letter agreement, only 40 percent of petitioner's 5-percent equity interest in BAC vested upon the closing of the RBFD transaction. The remaining portion of petitioner's equity interest in BAC was to vest over the length of the employment contract, and then only if BAC met certain debt reduction and profit projection schedules contained in the agreement. Neither petitioner nor respondent addressed the application of section 83 to the transaction in issue. At trial, however, petitioner offered, and the Court received into evidence, a document containing a section 83(b) election for petitioner's potential equity interest in BAC. The document had not been executed by petitioner. Additionally, at trial, *134 petitioner testified as follows: Q. Do you recall having seen this document before? A. Yes. Q. What is it? A. It is an 83(b) election. Q. Was it ever finalized? A. Well it wasn't finalized because the deal never closed, but effectively what it is, it allows me -- or would have allowed me, had the deal closed, and had my stock been a vesting stock, which it would have been, as Quigley described in his testimony here that this stock was going to vest in two ways, one on performance and the other on time. So what this did was allow me to not pay the gross amount of income tax that would have come had I owned the stock 100 percent outright had the deal closed, and I would have paid capital gains on the sale of any stock in the future. So that is, without being technical, the result of the 83(b). Q. It sounds better than what most tax lawyers would do. A. I have done a lot of deals. Had petitioner acquired an equity interest in BAC, it clearly would have been received in connection with her performance of services; i.e., either for services she performed for A&S or for the services that she would have performed for BAC had the RBFD transaction closed. *135 Consequently, even if we were to classify a part of the settlement payment as having been received in lieu of petitioner's equity interest in BAC, it would not end the inquiry. If property is to be received in connection with the performance of services, as in the instant case, it is still taxable under section 83 as ordinary income, absent the filing of a section 83(b) election. Alves v. Commissioner, supra at 877. Consequently, we hold that, even if petitioner had shown that the settlement payment she received from A&S related in whole or part to her potential equity interest in BAC, we would conclude that it was received in connection with the performance of services, and therefore, is taxable as ordinary income. [16]
*136 Because we hold for respondent on other grounds, we need not decide whether BAC was a collapsible corporation within the meaning of section 341. Based on the foregoing, Decision will be entered for respondent. Appendix BAC
Equity Ownership
Amount Shareholder
Percentage
(in millions)
Equitable
46.00
$ 34.50
Management [1]
15.00
11.25
Outside investors/
3.00
2.25
directors [2] *137 A&S
Revlon Partners
26.67
20.00
Co-Investment [3]
6.67
33.33
5.00
25.00
Subtotal
97.33
73.00
Overage
2.67
2.00
Total
100.00
[4] 75.00
Footnotes
1. See Beauty Acquisition Corp. v. Commissioner, T.C. Memo. 1995-87↩, a Memorandum Opinion filed today involving some of the same transactions in issue in the instant case.
2. See supra↩ note 1.
3. Revlon Partners was a limited partnership organized by A&S to invest in the RBFD purchase on behalf of the Fund. A&S was the general partner of Revlon Partners. Petitioner was not a partner in Revlon Partners.↩
4. Because the RBFD transaction never closed, Equitable never funded either its debt or its equity commitments, but it did receive $ 15,300,000 of the Revlon settlement proceeds.↩
5. The outline prepared by Mr. Quigley shows that the total amount of equity financing was to be $ 75 million and not the $ 76,670,000 figure stated in A&S' letter, dated Oct. 3, 1985. The parties have failed to account for this discrepancy.↩
6. During 1985, a draft election to include stock in gross income pursuant to sec. 83(b)↩ was prepared for petitioner, but was never executed.
7. Respondent alternatively contends that the settlement payment constitutes ordinary income because BAC was a collapsible corporation within the meaning of sec. 341.↩
8. This line of cases was not affected by the Supreme Court's decision in Arkansas Best Corp. v. Commissioner, 485 U.S. 212 (1988). Id.↩ at 217 n.3.
9. The Dec. 18, 1984, letter agreement expired, by its own terms, on Nov. 30, 1985.↩
10. Handwriting below the typed portion of petitioner's memorandum, dated Dec. 6, 1985, states that 25 percent of the breakup fee, less expenses, would be paid to "L.W."↩
11. Net expenses included payments to accountants, lawyers, consultants, and other professionals who performed personal services in connection with the RBFD transaction and subsequent litigation.↩
12. According to A&S' final breakdown of expenses and allocations from the RBFD transaction, A&S made $ 1,400,000 in third party payments. The individuals who are listed as receiving third party payments are the same individuals listed as "Outside Investors/Directors". See appendix. It is not clear from the record in the instant case whether these individuals were just equity investors or whether they provided services in connection with the RBFD transaction.↩
13. During the course of BAC's negotiations for the RBFD, petitioner was required to reside in New York City. The record shows that A&S advanced petitioner $ 50,000 during 1985 to help petitioner meet the expenses she incurred while living in New York City.↩
14. Petitioner's receipt of medical insurance benefits "customarily accorded to employees of A&S or like stature" also tends to show that petitioner was more than a mere equity investor in BAC.↩
15. The employment status of the service provider, i.e., whether the service provider is properly classified as an employee or an independent contractor, does not affect the application of sec. 83. Sec. 1.83-1(a), Income Tax Regs.↩
16. During the course of the trial, respondent sought to introduce a document prepared by A&S' counsel. Petitioner objected on the grounds of attorney-client privilege. In reaching our decision in the instant case, we do not rely on the proffered document; consequently, we need not decide whether such document is admissible into evidence.↩
1. Management (1) 5 percent issued at closing to LJW as follows: ↩
Cash:
$ 1,00
Notes:
2.75
Total
3.75
2. OUTSIDE INVESTORS/DIRECTORS ↩
Amount of Investment
Name
(in 000's)
Andrew G. Galef *
$   800
President
The Spectrum Group
Jeffrey S. Deutschman
100
Vice President
The Spectrum Group
Robert D. Walter
100
Frederick Frank
100
Managing Director
Shearson/Lehman Bros.
Curt Engelhorn
100
Chairman & President
Corange, LTD
Robert E. McGill, III *
200
Senior Vice President
The Dexter Corp.
George J. Greenberg *
200
Chairman, CEO
Loehmann's
Leslie H. Wexner *
200
Chairman
The Limited
Brian Wolfson *
200
Chairman
Anglo-Nordic
Jack Friedman
500
Florasynth, Inc.
Kirkland & Ellis
100
Reavis & McGrath
100
Total
2,250
* Board member. Board members to receive $ 12,000 retainer plus
$ 2,000 board meeting plus $ 1,000 per committee meeting if held on
a different day. Travel reimbursed.
3. A&S Co-Invest ↩
Shareholder
Amount
Adler
$ 2,060,000
Shaykin
2,060,000
Behr
280,000
Murphy
100,000
Bruce
100,000
Quigley
200,000
MHVoC
200,000
Total
5,000,000
4. Purchase Price Composition (in millions) ↩
Cash
$ 64.75
Notes
2.75
Received at closing
67.50
Received for future issuance
7.50
Total
75.00