# United States Tax Court

T.C. Memo. 2025-88

CORRI A. FEIGE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 10998-20.                           Filed August 18, 2025.

_____

*David C. Rohlfing*, for petitioner.

*Adriana E. Vargas* and *Ara Derhartonian*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

MARSHALL, *Judge*: In a Notice of Deficiency dated February 18, 2020 (Notice), respondent determined a deficiency of $88,856, an addition to tax of $8,121 under section 6651(a)(1)[1] for failure to timely file, an addition to tax of $9,023 under section 6651(a)(2) for failure to timely pay, and an addition to tax of $543 under section 6654(a) for petitioner's failure to make estimated tax payments for her 2014 tax year (year at issue). The issues for decision are whether petitioner (1) had unreported income for the year at issue from stock that her former employer transferred to her and (2) is liable for additions to tax under sections 6651(a)(1) and (2) and 6654. For the reasons discussed below, we hold that petitioner (1) had unreported income for the year at issue from stock that her former employer transferred to her, (2) is liable

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Except where otherwise indicated, all monetary amounts are rounded to the nearest dollar.

**[\*2]** for an addition to tax under section 6651(a)(1), and (3) is not liable for additions to tax under sections 6651(a)(2) and 6654.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The First Stipulation of Facts, the Second Stipulation of Facts, the Third Stipulation of Facts, and the accompanying Exhibits are incorporated herein by this reference. Petitioner resided in Alaska when she timely filed the Petition.

I.    *Petitioner's Stock Rights*

Petitioner was employed by Linc Energy Operations, Inc. (Linc), from February 2010 through November 5, 2014. During the term of her employment, petitioner routinely traveled 80 miles from her home in Chickaloon, Alaska, to Linc's office in Anchorage, Alaska. Linc was a U.S. subsidiary of Linc Energy, Ltd. (Linc Energy), an Australian corporation. Linc Energy's shares were traded on the Australian Securities Exchange and, later, on the Singapore Exchange. Upon employment and as part of her compensation in connection with her performance of services to Linc, petitioner was permitted to participate in the Linc Energy Performance Rights Plan (Performance Rights Plan). The Performance Rights Plan permitted petitioner to receive stock in Linc Energy as compensation for her services. On August 4, 2011, under the Performance Rights Plan, petitioner accepted a rights award in a rights issue offer (RIO)[2] from Linc Energy under which she acquired 60,000 unvested rights in Linc Energy stock (original allocation).

Under section 6.2 and 6.3 of the Performance Rights Plan, petitioner's interest in the rights could vest in full ordinary shares of Linc Energy stock in two circumstances. First, if on the vesting date petitioner's rights had neither expired nor lapsed, then her interest in the rights would vest. Under Section 4.4 of the Performance Rights Plan, rights expired or lapsed on the earlier of:

(a) the Vesting Date if the Performance Conditions have not been satisfied by the Vesting Date; or

---

[2] Under the Performance Rights Plan, an RIO is the right of an employee to have their interest converted to ordinary shares of stock on the vesting date.

**[*3]**    (b) the termination of employment, subject to a determination of the Board under clause 6.3.

Second, petitioner's interest in rights could also vest under section 6.3 of the Performance Rights Plan if Linc Energy's board of directors, "in its absolute discretion," determined that a "Qualifying Event"[3] occurred and waived "any Performance Conditions or the Performance Period, or a combination thereof to allow for the vesting and conversion of Rights."

Petitioner's rights were subject to a three-year vesting schedule where she received 20,000 shares in Linc Energy stock on each of July 31, 2011, 2012, and 2013. Under the Performance Rights Plan and the RIO, on each vesting date or the next business day, the rights to which petitioner was entitled converted to ordinary, fully paid shares. During these years and while Linc Energy was listed on the Australian Securities Exchange, the shares were retained on petitioner's behalf by a holding company set up by Linc Energy. Petitioner elected and gave instructions to Linc Energy to sell 33% of her rights in each of the three tranches to satisfy her U.S. tax obligations upon vesting.[4] All of petitioner's rights under the RIO vested, and petitioner satisfied her tax obligations for each tranche of shares as they vested in accordance with the vesting schedule. Under section 10.2 of the Performance Rights Plan, petitioner was required to give written notice to the Linc Energy company secretary regarding any matters related to the Performance Rights Plan.

On July 25, 2013, petitioner accepted an additional allocation of rights under the Performance Rights Plan (additional allocation) under terms similar to those of the original allocation.[5] Under the additional allocation, petitioner was entitled to an additional 400,000 rights under a four-year vesting schedule whereby she was to receive 100,000 shares

---

[3] The Performance Rights Plan defined a "Qualifying Event" as "in relation to a Participant, the cessation of employment of the Participant with the Group [Linc Energy and its related corporate entities] due to his or her death, retrenchment by reason of redundancy, Permanent Disability or any other reason determined by the Board from time to time."

[4] The RIO contained an election to satisfy petitioner's tax withholding obligation related to the original allocation. The election to satisfy the tax withholding obligation that petitioner selected refers to her affirmative election to "Sell 33% of Rights to cover tax." While the election refers to selling "rights" we believe Linc Energy meant selling "shares." Nonetheless, for purposes of this report, we will adopt the convention used by Linc Energy.

[5] All of the stock that petitioner received under the Performance Rights Plan and the RIO was received in connection with her performance of services to Linc.

**[\*4]** in Linc Energy stock after her yearly performance of services on each of December 21, 2013, 2014, 2015, and 2016. The additional allocation was subject to the Performance Rights Plan and had terms similar to those of the initial RIO; however, it did not include an election for a portion of the rights to be sold to satisfy petitioner's tax obligations. Nonetheless, via email correspondence from petitioner's Linc email account, petitioner instructed Linc Energy to continue with the instructions from the original allocation: to sell 33% of the rights to satisfy her tax obligations as each tranche of rights vested. The first tranche of rights vested on December 21, 2013, and, consistent with petitioner's instructions, Linc Energy sold 33% of the rights to satisfy her tax obligations.

In late 2013 and early 2014, as Linc Energy moved its shares from the Australian Securities Exchange to the Singapore Exchange, petitioner was required to establish a new account to hold her Linc Energy shares because they could no longer be held by an Australian holding company on her behalf. She established an account with Charles Schwab, and her Linc Energy shares were all transferred into that account.

II.    *Separation from Linc Energy*

From approximately 2014 and during times relevant to this case Linc Energy was in financial distress, and the company contracted operations and personnel. On November 24, 2014, Linc Energy and petitioner entered into a separation agreement which terminated petitioner's employment as of November 5, 2014. Petitioner could revoke the separation agreement within seven calendar days after she signed it by providing written notice of revocation to Linc's human resources or legal department. The severance agreement provided petitioner with six weeks of her base salary (less taxes and deductions), payment for accrued vacation time, and health benefits through the end of the month of the separation date. Paragraph 5 of the separation agreement also provided that unvested performance rights would be forfeited at the time of termination of employment. It required petitioner to fulfill her obligation to continue working until the separation date, return all company property (including confidential information) by the separation date, and abide by the terms of the separation agreement and Linc Energy policies. It did not contain ongoing obligations, a covenant not to compete, or a condition that would require petitioner to return remuneration agreed upon in the separation agreement. The separation agreement was not effective until execution, and remuneration under

[*5] the separation agreement was not disbursed until after the date of execution.

On December 3, 2014, Linc transferred to petitioner 100,000 shares of Linc Energy stock (disputed shares). Petitioner learned of the stock transfer in early January 2015 when she received her December 31, 2014, brokerage statement that showed 100,000 shares of Linc Energy stock had been deposited into her Charles Schwab account. In early 2015, petitioner called a Linc administrative employee in its Houston office and Linc Energy's company secretary in the Brisbane office[6] regarding the transfer of the disputed shares. However, both employees had also separated from Linc and Linc Energy. It is unclear to what extent, if any, petitioner tried to reach anyone else at Linc or Linc Energy; ultimately, she did not receive guidance or direction about the share transfer. Petitioner did not, however, email or give written notice to anyone at Linc or Linc Energy regarding her belief that the share transfer was in error, including Linc's human resources or legal department. Nor did she provide written notice to Linc Energy's company secretary regarding any issues under the terms and conditions of the Performance Rights Plan (i.e., that she received the share transfer in error), as required under the Performance Rights Plan.

At the end of January 2015, petitioner received Form W–2, Wage and Tax Statement, from Linc reporting $75,660 as compensation from the exercise of nonstatutory stock options. Petitioner contacted Linc's third-party payroll administrator to correct the Form W–2, but the administrator was not authorized to issue petitioner a new Form W–2. Petitioner never transacted or sold any of the disputed shares.

III.    *Tax Return Preparation*

During the tax year at issue and at all times relevant to this case, petitioner and her husband, Eric Feige, were married. Generally, they filed their tax returns jointly. They had a history of complying with their tax filing and payment obligations; however, they did not file their tax return for the year at issue. Petitioner's Internal Revenue Service (IRS) account transcript for the 2014 tax year (2014 transcript) shows that she did not timely file a return for the 2014 tax year.[7] Petitioner knew that she was required to file a federal income tax return for the year at issue

---

[6] The company secretary in the Brisbane office was in charge of the Performance Rights Plan.

[7] Additionally, the record does not contain a copy of petitioner's federal income tax return for 2013 or evidence that petitioner failed to file a return for 2013.

[*6] but did not do so. Petitioner knew that each year Mr. Feige prepared their joint tax return using TurboTax software. He never sought outside help in preparing their joint tax returns because there were no accountants or tax professionals in or near Chickaloon. Mr. Feige does not have any background in tax preparation or accounting, and he has not taken any formal tax preparation education courses.

In 2019, petitioner and Mr. Feige sought the advice of legal counsel after respondent sent petitioner a notice regarding the year at issue. Respondent prepared a substitute for return (SFR) under section 6020(b) for the year at issue and then issued the Notice, wherein he determined a deficiency based on the SFR and related additions to tax. After petitioner received the Notice and filed the Petition, her case was forwarded to respondent's Independent Office of Appeals (Appeals). On March 24, 2021, petitioner and Mr. Feige submitted a joint return for the year at issue to Appeals based on what they believed was the correct amount of tax owed. They included all compensation reported as paid to them by third parties except for the $75,660 reported by Linc with respect to the December 3, 2014 share transfer.

OPINION

I.    *Burden of Proof*

Generally, the Commissioner's determinations in the Notice of Deficiency are presumed correct, and the taxpayer bears the burden of proving that the determinations are incorrect. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Section 7491(a) provides that if, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for any tax imposed by subtitle A or B and meets other prerequisites, the Commissioner shall have the burden of proof with respect to that issue. *See Higbee v. Commissioner*, 116 T.C. 438, 440–41 (2001).

In unreported income cases the Commissioner must either establish a minimal evidentiary showing connecting the taxpayer with the alleged income-producing activity or demonstrate that the taxpayer actually received unreported income. *See Walquist v. Commissioner*, 152 T.C. 61, 67 (2019); *see also Weimerskirch v. Commissioner*, 596 F.2d 358, 361–62 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977).[8] Only after the

_____

[8] Absent a stipulation to the contrary, an appeal of this case would presumably lie in the U.S. Court of Appeals for the Ninth Circuit. *See* § 7482(b)(1)(A).

**[\*7]** Commissioner makes the required threshold showing does the burden shift to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. *Walquist*, 152 T.C. at 67–68.

Respondent established the requisite evidentiary foundation linking petitioner with an income-producing activity. Petitioner was employed by Linc and participated in the Performance Rights Plan and the RIO under which the additional allocation was issued. Additionally, petitioner does not contest that she received the disputed shares on December 3, 2014.

Section 6020(b) provides that, when preparing an SFR, the Secretary shall make such return from his own knowledge and from such other information as he can obtain through testimony or otherwise. Among other things, the Commissioner may rely on Forms W–2 and 1099–MISC, Miscellaneous Income, from third-party payors when determining a taxpayer's tax liability. *See, e.g.*, *Cabirac v. Commissioner*, 120 T.C. 163, 165–67 (2003), *aff'd*, No. 03-3157, 2004 WL 7318960 (3d Cir. Feb. 10, 2004); *Spurlock v. Commissioner*, T.C. Memo. 2003-124, 85 T.C.M. (CCH) 1236, 1241. However, if in a court proceeding a taxpayer asserts a reasonable dispute with respect to any item of income reported on an information return filed with the Secretary, and if the taxpayer has fully cooperated with the Secretary, the Secretary has the burden of producing reasonable and probative information concerning the deficiency in addition to the information return. *See* § 6201(d).

Petitioner does not contest that she received the disputed shares, although she argues that she was not entitled to the shares and therefore should not be liable for tax with respect to them. She does, however, contest the accuracy of the amount reported on the Form W–2 that was attributed to the disputed shares. Specifically, petitioner states that the Form W–2 reported $75,660 of wage compensation that was attributable to the disputed shares but notes that the December 31, 2014 Charles Schwab account statement indicates that the disputed shares were valued at $0.6867 (or $68,670 in the aggregate) on December 3, 2014, when they were transferred to her. She further notes that the shares declined in value to $0.5584 per share as of December 31, 2014, and $0.4010 per share as of March 31, 2015.

We construe petitioner's statements as asserting a reasonable dispute with respect to the $75,660 of income that was reported on the

[*8] Form W–2 by Linc. However, neither party addresses the application of section 6201(d) here. Petitioner does not argue that the burden of producing reasonable and probative information relating to the value of the disputed shares on the date of transfer has shifted to respondent. Further, we note that under section 6201(d), petitioner has an obligation to fully cooperate with the Secretary. Petitioner's failure to file a return for the 2014 tax year until 2021 (which was also after respondent prepared the SFR) is a failure to cooperate with respondent as required under section 6201(d). *See McQuatters v. Commissioner*, T.C. Memo. 1998-88, 75 T.C.M. (CCH) 1909, 1912. "As a nonfiler, [the taxpayer] plainly did not bring his dispute over any item of income to the attention of the IRS within a reasonable period of time as contemplated by the terms and legislative history of section 6201(d)." *Id.*; *see also Mayer v. Commissioner*, T.C. Memo. 2000-295, 80 T.C.M. (CCH) 393, 395, *aff'd*, 29 F. App'x 706 (2d Cir. 2002). Thus, section 6201(d) does not apply, and petitioner must prove by a preponderance of the evidence that respondent's determinations are arbitrary and erroneous. *See Hardy v. Commissioner*, 181 F.3d 1002, 1004 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97.

II.    *Deficiency*

A.     *Income from Vested Stock Rights*

Gross income includes compensation for services, "including fees, commissions, fringe benefits, and similar items." § 61(a)(1). Section 83(a) provides in pertinent part that if property is transferred to a taxpayer in connection with the performance of services, the excess of the fair market value of the property over the amount, if any, paid for the property shall be included in the taxpayer's gross income in the first year in which the taxpayer's rights in the property are transferable or are not subject to a substantial risk of forfeiture. *See Montgomery v. Commissioner*, 127 T.C. 43, 53–54 (2006). As a result, "property must be substantially vested for the transferee to be regarded as the owner of the property, and, thus, taxed upon its receipt." *Tanner v. Commissioner*, 117 T.C. 237, 241–42 (2001) (citing Treas. Reg. § 1.83-1(a)(1)), *aff'd*, 65 F. App'x 508 (5th Cir. 2003).

Treasury Regulation § 1.83-3(d) further explains that

[p]roperty is transferable if the person performing the services or receiving the property can sell, assign, or pledge (as collateral for a loan, or as security for the performance

**[*9]** of an obligation, or for any other purpose) his interest in the property to any person other than the transferor of such property and if the transferee is not required to give up the property or its value in the event the substantial risk of forfeiture materializes.

Whether a risk of forfeiture is substantial depends on the facts and circumstances. *Id.* para. (c)(1).

> [A] substantial risk of forfeiture exists only if rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or upon the occurrence of a condition related to a purpose of the transfer if the possibility of forfeiture is substantial.

*Id.* "The risk of forfeiture analysis requires a court to determine the chances the *employee* will lose his rights in property transferred by his employer." *Theophilos v. Commissioner*, 85 F.3d 440, 447 n.18 (9th Cir. 1996), *rev'g on other grounds* T.C. Memo. 1994-45. The Ninth Circuit has clarified that, if the issuance of stock is not conditioned on the future performance of substantial services or the occurrence of a condition related to a purpose of the transfer, then a contract for stock between an employer and employee is binding upon transfer and therefore there is no substantial risk of forfeiture. *Id.* at 447.

Stock is property for purposes of section 83. *Kadillak v. Commissioner*, 127 T.C. 184, 195 (2006), *aff'd*, 534 F.3d 1197 (9th Cir. 2008). Under Treasury Regulation § 1.83-3(e), "property" includes real and personal property other than money or an unfunded and unsecured promise to pay money or property in the future. "Property transferred to an employee or an independent contractor (or beneficiary thereof) in recognition of the performance of, or the refraining from performance of, services is considered transferred in connection with the performance of services within the meaning of section 83." *Id.* para. (f). Section 83 applies to the transfer of such property whether the "transfer is in respect of past, present, or future services. Treas. Reg. § 1.83-3(f).

Whether property was transferred in connection with the performance of services is a question of fact. *Bagley v. Commissioner*, 85 T.C. 663, 669 (1985), *aff'd per curiam*, 806 F.2d 169 (8th Cir. 1986). "Where the transfer of property is governed by the terms of an employment agreement, we have generally found that the taxpayer

**[\*10]** received the property in connection with the performance of services." *Wachner v. Commissioner*, T.C. Memo. 1995-88, 69 T.C.M. (CCH) 1982, 1992 (first citing *Bagley*, 85 T.C. at 669; and then citing *Alves v. Commissioner*, 79 T.C. 864 (1982), *aff'd per curiam*, 734 F.2d 478 (9th Cir. 1984)); *see also Putchat v. Commissioner*, 52 T.C. 470 (1969) (holding that an amount received by a taxpayer in exchange for the release of all his rights under an employment agreement, which included the release of his right to exercise a stock option, was compensatory in nature, and was therefore taxable as ordinary income), *aff'd*, 425 F.2d 737 (3d Cir. 1970).

B.     *The Parties' Arguments*

Petitioner argues that she is not required to include the value of the disputed shares in her gross income because she lacked dominion and control over them. Specifically, petitioner argues that (1) the shares were transferred contrary to the terms of the Performance Rights Plan and therefore they were subject to an ongoing claim by Linc Energy under Alaska law and (2) the Linc Energy board of directors did not unilaterally amend the Performance Rights Plan to accelerate petitioner's vesting in the disputed shares before her termination date. We construe these arguments as petitioner's challenging whether the disputed shares were transferable or subject to a substantial risk of forfeiture for purposes of section 83. Respondent on the other hand argues that petitioner is required to include the value of the disputed shares in income because (1) she received the disputed shares as compensation in connection with her performance of services for Linc, (2) the disputed shares were not subject to a substantial risk of forfeiture, and (3) petitioner had complete control over the disputed shares as they were transferable once she received them. For the reasons discussed below, we hold that petitioner is required to include the value of the disputed shares as reported on the Form W–2 in her gross income for the year at issue.

C.     *Analysis*

As discussed *supra* Opinion Part II.A, the disputed shares are property under section 83. Additionally, the record demonstrates that they were transferred to petitioner in connection with her performance of services for Linc Energy's subsidiary, Linc, because (1) petitioner participated in the Performance Rights Plan and the RIO under which the additional allocation was issued, (2) the Performance Rights Plan permitted petitioner to receive stock in Linc Energy as compensation for

**[*11]** her services, (3) petitioner acknowledged that stock she received under the Performance Rights Plan was connected with her performance of services for Linc, (4) petitioner received stock on schedule after completion of services, and (5) the issuance of the disputed shares was consistent with the additional allocation and the prior year where petitioner's yearly allotment of stock was issued at yearend after her yearly performance of services. Thus, the questions we must decide are whether the disputed shares were subject to a substantial risk of forfeiture upon their receipt by petitioner or transferable by petitioner. *See* § 83(a).

1. *Substantial Risk of Forfeiture*

For the reasons discussed below, we hold that the disputed shares were not subject to a substantial risk of forfeiture. On November 24, 2014, Linc Energy and petitioner entered into a separation agreement which terminated petitioner's employment as of November 5, 2014. Petitioner could revoke the separation agreement within seven calendar days after signing by providing written notice of revocation to Linc's human resources or legal department. On December 3, 2014, two days after the end of the revocation period, Linc Energy transferred the disputed shares to petitioner's Charles Schwab account. At trial, petitioner conceded that she was not expected to perform any other services to receive the disputed shares as they were transferred to her after she separated from Linc. Additionally, the separation agreement did not include a covenant not to compete or conditions that would require petitioner to return any remuneration to Linc or Linc Energy. Thus, the first test in Treasury Regulation § 1.83-3(c)(1) suggests there is no substantial risk of forfeiture because petitioner's rights in the disputed shares were not conditioned on the future performance (or refraining from performance) of substantial services by any person.

Similarly, the second test in Treasury Regulation § 1.83-3(c)(1) also suggests no substantial risk of forfeiture because there was no condition related to the purpose of the transfer (i.e., remunerating petitioner for her services) that would have created a substantial possibility of forfeiture of the disputed shares if the condition was unsatisfied. We also note that the separation agreement did not impose ongoing obligations, a covenant not to compete, or a condition that would require petitioner to return remuneration. Thus, the separation agreement cannot be construed as a condition related to the purpose of the transfer. Accordingly, we hold that there was not a substantial risk of forfeiture of the disputed shares.

**[\*12]**　　2.　*Transferability*

Next, we address whether the disputed shares were transferable by petitioner. Petitioner frames the issue as an income inclusion of treasure trove property under section 61 and *Cesarini v. United States*, 296 F. Supp. 3, 6–7 (N.D. Ohio 1969), *aff'd per curiam*, 428 F.2d 812 (6th Cir. 1970). Petitioner relies on *Cesarini* and Alaska state law to argue that the disputed shares were treasure trove and therefore not includible in income until she had undisputed possession. Additionally, we construe her reliance on *Cesarini* and Alaska law as challenging whether the disputed shares were transferable for purposes of Treasury Regulation § 1.83-3(b) and (d). Petitioner's arguments are intertwined, and we address them accordingly.

In *Cesarini*, 296 F. Supp. at 7–8, the court held that treasure trove income is not includible in a taxpayer's income under section 61(a) until all challenges under state law for claim of the treasure trove have expired. Petitioner argues that she did not have complete dominion over the disputed shares because they were treasure trove property. She further argues that because they were treasure trove property, under Alaska Stat. § 45.08.202 (2014), she had a right to transact in the shares only if she did not have knowledge of the defective transfer. However, because she knew that the shares were not hers, the shares (or proceeds therefrom) were subject to an ongoing claim by Linc Energy (or its successors) for at least three years after receipt.[9] Petitioner's argument concludes that the value of the disputed shares was includible in her gross income under section 61(a) only after the limitation period to recover the stock lapsed, which was at least three years after she received it.

Petitioner's framing of the issue as one governed by section 61 misses the mark. Under Treasury Regulation § 1.61-2(d)(1), the compensation for services paid in property is includible income as compensation except as provided in Treasury Regulation § 1.61-2(d)(6)(i). Treasury Regulation § 1.61-2(d)(6)(i) in turn creates an exception for property transferred as compensation for services after June 30, 1969, and specifies that the rules of section 61 shall not be applied if the rules are inconsistent with section 83. We note that the tax consequences (i.e., the timing of the income inclusion) that result

---

[9] Petitioner states that it is unclear which limitation period applies under Alaska law but that the potentially applicable rules provide for a three-year limitation period.

**[\*13]** from treating the disputed shares as treasure trove under section 61(a) would be inconsistent with section 83. Because section 83 is the more specific provision, "it governs the more general terms of section 61." *Cf. Toso v. Commissioner*, 151 T.C. 27, 34 (2018) (citing *D.B. v. Cardall*, 826 F.3d 721, 735 (4th Cir. 2016)). Moreover, we have consistently analyzed the transfer of stock as compensation for services under section 83. *See Austin v. Commissioner*, 141 T.C. 551, 566–68 (2013); *Hilen v. Commissioner*, T.C. Memo. 2005-226, 90 T.C.M. (CCH) 333, 334–36; *Theophilos*, 67 T.C.M. (CCH) at 2114–19; *Koss v. Commissioner*, T.C. Memo. 1989-330, 57 T.C.M. (CCH) 882, 893–95, *aff'd*, 908 F.2d 962 (3d Cir. 1990) (unpublished table decision).

Furthermore, we disagree with petitioner's characterization of the shares received from Linc Energy as treasure trove property. Petitioner argues that this case is analogous to *Cesarini*, 296 F. Supp. at 6–7, and that an asset that is classified as treasure trove property is not includible in income until the taxpayer has undisputed possession (including the expiration of challenges under state law). The facts in this case differ significantly from those in *Cesarini*. First, unlike in *Cesarini*, there is no uncertainty as to the parties that can claim the disputed shares. Moreover, in *Cesarini* the taxpayers found cash inside a used piano that they had purchased seven years earlier at an auction sale. *Id.* at 4. Those taxpayers had no knowledge of who was the rightful owner of the cash. *Id.* Here, petitioner knew that she and Linc Energy were the only two parties that had a claim to the disputed shares. This was not a case of discovered property where the potential owners were unknown to the finder. Rather petitioner's employer transferred the stock to her under the terms of the Performance Rights Plan and the additional allocation. And as discussed *supra* Opinion Part II.C, we found that the stock was transferred to petitioner in connection with her performance of services for Linc. Finally, petitioner does not allege that any party other than she or Linc Energy could have a claim to the stocks.[10]

In short, petitioner's treasure trove argument and her mistaken belief that Alaska Stat. § 45.08.202 impeded her transacting in the disputed shares do not align with the facts in this case. We find that the

---

[10] Additionally, because we find that the property at issue is not properly characterized as treasure trove property, Treasury Regulation § 1.61-14(a) (miscellaneous items of gross income including treasure trove income) is inapplicable, and petitioner's reliance on Alaska Stat. §§ 45.08.202 (issuer's responsibility and defenses; notice of defect or defense regarding an investment security) and 45.08.105(a) (2014) (notice of adverse claim regarding an investment security) are not relevant to this case.

[*14] disputed shares were transferable because petitioner had full ownership and control over them; and as discussed above, there were no impediments to her transacting in or selling the disputed shares. Moreover, as we discussed *supra* Opinion Part II.C.1, there was not a substantial risk of forfeiture vis-a-vis petitioner; therefore, there was not a risk to any transferee of petitioner that they would have to relinquish the disputed shares. In other words, petitioner was able to "sell, assign, or pledge . . . [her] interest in the property to any person other than the transferor . . . and . . . the transferee [would] not [be] required to give up the property or its value in the event the substantial risk of forfeiture materializes." *See* Treas. Reg. § 1.83-3(d).

### 3.  *Petitioner's Remaining Arguments*

Petitioner argues that the disputed shares were distributed in contravention of the Performance Rights Plan and the separation agreement; therefore, she did not consider the shares to be her property. She continues that, because the shares were not granted to her in accordance with the terms of her employment and separation arrangements, she did not have undisputed possession of the shares for purposes of inclusion under section 61. Petitioner relies on section 4.4 of the Performance Rights Plan, which states that any unvested rights expire or lapse upon the earlier of (1) a vesting date where conditions are not satisfied or (2) termination of the participant's employment. Similarly, petitioner relies on paragraph 5 of the separation agreement, which provided that she forfeited all performance rights that had not vested as of the day the agreement became effective, November 5, 2014. Finally, petitioner argues that even if the board exercised its right to unilaterally amend the Performance Rights Plan and transfer the shares to petitioner before the vesting date, December 21, 2014, the separation agreement superseded the Performance Rights Plan and, therefore, the board did not have the authority under the separation agreement to unilaterally change or otherwise award petitioner shares.

We do not read the separation agreement to supersede the Performance Rights Plan. We agree with respondent that the Performance Rights Plan takes into account an employee's possible future termination and contradicting agreements by stating in section 4.4(b) that the expiration or lapse of rights is subject to a determination of the board under the terms of section 6.3. Section 6.3 of the Performance Rights Plan is the provision that gave the board "absolute discretion" to determine that a "Qualifying Event" occurred and to change an employee's vesting date or waive performance conditions or

**[*15]** the performance period or a combination thereof "to allow the vesting and conversion of [r]ights." This suggests to us that the Performance Rights Plan remained the controlling contract for matters related to stock issuance.

We also note that, while there is no direct evidence that the board exercised its right to unilaterally amend the Performance Rights Plan regarding the vesting date of petitioner's stock rights, Linc Energy's transfer of the shares to petitioner before the vesting date is circumstantial evidence that the board unilaterally amended the Performance Rights Plan. Nonetheless, our conclusion does not require us to find that the board unilaterally amended the Performance Rights Plan and accelerated petitioner's vesting date or waived the performance conditions or the performance period because, regardless of whether Linc Energy's actions were consistent with the Performance Rights Plan and the separation agreement, it transferred the Linc Energy shares to petitioner and neither Linc nor Linc Energy sought to recover the shares from her in the months or even years following the transfer. Linc Energy's failure to take any action to recover the shares from petitioner in the subsequent months and years suggests that it transferred the shares to her believing that (1) it had no interest in the shares, (2) they rightfully belonged to petitioner, and (3) they were not subject to recovery. However, as discussed above, there is no direct evidence as to whether the disputed shares were mistakenly issued by Linc Energy or pursuant to the Performance Rights Plan and the additional allocation. In the absence of direct evidence, we find that the evidence on this issue is in equipoise. Petitioner bears the burden of proof and has failed to carry her burden and show that the disputed shares were mistakenly issued.

Petitioner also appears to argue that section 83 is inapplicable because she did not make an affirmative election under section 83 with respect to the Performance Rights Plan. Neither section 83 nor its underlying regulations states that it is inapplicable unless a taxpayer makes an affirmative election to apply section 83. The applicability of section 83 is not subject to a taxpayer's election. We note that section 83(b) contains a timing election for the person providing services, in connection with which property is transferred, to include in his gross income the value of the property received in the tax year of the transfer. This is in contrast to the general rule under section 83(a) where the value of the property is included in gross income in the tax year in which the rights of the person having the beneficial interest in the property are transferable or are not subject to a substantial risk of forfeiture. The

**[*16]** flush text in section 83(b)(1) further explains that, if an election is made under section 83(b), then section 83(a) shall not apply to the transfer of property, and if the property is subsequently forfeited, the taxpayer is not permitted a deduction with respect to such forfeiture. Thus, the election in section 83(b) addresses the timing of the inclusion and not the general applicability of section 83. *See Bumgarner v. Commissioner*, T.C. Memo. 1997-48, 73 T.C.M. (CCH) 1841, 1842 ("Section 83(b) is an alternate timing provision; it does *not* provide that property received for services is excludable from gross income unless one elects to so include it, as [the taxpayer] posits.").

### 4. *Conclusion*

We conclude that, when Linc Energy transferred the disputed shares to petitioner on December 3, 2014, as compensation for her services, she had full ownership and control over the shares and there were no impediments to her transacting in or selling the disputed shares. Therefore, the value of the shares that was reported on the Form W–2 must be included in petitioner's gross income for the first tax year where her interest in the property was either transferable or not subject to a substantial risk of forfeiture. As discussed *supra*, we hold that as of December 3, 2014, (1) petitioner could transfer the disputed shares and (2) there was no substantial risk of forfeiture. Accordingly, the value of the disputed shares that was reported on the Form W–2 should have been included in petitioner's gross income for 2014.

### III. *Additions to Tax*

In the Notice, respondent determined that petitioner was liable for an addition to tax of $8,121 under section 6651(a)(1) for failure to timely file, an addition to tax of $9,023 under section 6651(a)(2) for failure to timely pay, and an addition to tax of $543 under section 6654(a) for failure to make estimated tax payments.

The Commissioner bears the burden of producing sufficient evidence to show that it is appropriate to impose the additions to tax. *See* § 7491(c); *Wheeler v. Commissioner*, 127 T.C. 200, 206 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008); *Higbee*, 116 T.C. at 446–47.[11] Once the Commissioner meets the burden of production under section 7491(c), the taxpayer bears the burden of proving the additions to tax do not apply

---

[11] The written supervisory approval requirement found in section 6751(b)(1) does not apply to the section 6651 or section 6654 addition to tax. § 6751(b)(2)(A).

**[\*17]** because of reasonable cause or other exculpatory factors. *Wheeler*, 127 T.C. at 206; *Higbee*, 116 T.C. at 447.

A.    *Failure to File*

Section 6651(a)(1) imposes an addition to tax if a taxpayer fails to timely file a required income tax return, unless the taxpayer proves that such failure is due to reasonable cause and not due to willful neglect. *United States v. Boyle*, 469 U.S. 241, 245 (1985). The addition to tax under section 6651(a)(1) is 5% of the tax required to be shown on the return if the failure to file does not exceed one month, with an additional 5% per month while the failure continues, up to a maximum of 25%. A return is generally considered filed with the IRS when the return is delivered to and received by the IRS. *See, e.g.*, *United States v. Lombardo*, 241 U.S. 73, 76 (1916); *Trout v. Commissioner*, 131 T.C. 239, 246 (2008).

An SFR prepared by the Commissioner is disregarded for purposes of determining the amount of the taxpayer's liability for the addition to tax under section 6651(a)(1). § 6651(g)(1).

As discussed above, the section 6651(a)(1) addition to tax may be reduced if the taxpayer can establish that his failure to file timely was due to reasonable cause and not willful neglect. Willful neglect means a "conscious, intentional failure or reckless indifference." *Charlotte's Off. Boutique, Inc. v. Commissioner*, 121 T.C. 89, 109 (2003) (quoting *Boyle*, 469 U.S. at 245), *supplemented by* T.C. Memo. 2004-43, *aff'd*, 425 F.3d 1203 (9th Cir. 2005). Treasury Regulation § 301.6651-1(c)(1) gives some guidance on what constitutes reasonable cause for a taxpayer's failure to timely file. It provides, in relevant part, that "[i]f the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause."

Under section 6012(a) petitioner had an obligation to file a federal income tax return for the year at issue by April 15, 2015. *See* § 6072(a). In addition, petitioner stipulated that she was required to file a federal income tax return for the year at issue but did not do so. Respondent has satisfied his burden of production under section 7491(c) with respect to the section 6651(a)(1) addition to tax by attaching to the First Stipulation of Facts a copy of petitioner's 2014 transcript, which shows that petitioner did not file a federal income tax return for the year at issue. *Cf. Bruhwiler v. Commissioner*, T.C. Memo. 2016-18, at \*8 (citing

[*18] *Holmes v. Commissioner*, T.C. Memo. 2011-31, 101 T.C.M. (CCH) 1141, 1144). Below we consider whether petitioner had reasonable cause for her failure to do so.

Petitioner argues that her failure to timely file the return was "reasonable under the circumstances because the tax issues presented were complex and outside of petitioner's understanding." She further argues that she intended to file the return but could not because of the complexity of the issue and the lack of readily available tax professionals in the remote part of Alaska where she lived. Petitioner notes that 2014 was the only tax year for which she and her husband failed to file a tax return. Additionally, petitioner argues that at the time the return was due she experienced personal hardships that compounded the problem, including her unemployment and the illness and death of her father. Finally, she argues that she exercised ordinary business care to resolve the issue by requesting to have tax withheld from any distribution of shares under the Performance Rights Plan and contacting Linc to recover the shares.[12]

After careful consideration of the evidence, we decline to conclude that petitioner's failure to timely file her tax return for the year at issue was justified by reasonable cause. Both petitioner and her husband testified that they always filed their joint tax returns except for the year at issue. Moreover, petitioner knew that each year Mr. Feige prepared their joint tax return using TurboTax software. Thus, petitioner knew of a general duty to file her tax return as she and her husband had always done so in the preceding tax years. *See Schramm v. Commissioner*, T.C. Memo. 1991-523, 62 T.C.M. (CCH) 1053, 1055 (rejecting taxpayer's reasonable cause defense for section 6651(a)(1) addition to tax where taxpayer failed to file tax returns for years at issue but had filed tax return for a preceding year), *aff'd*, 988 F.2d 121 (9th Cir. 1993) (unpublished table decision); *Sine v. Commissioner*, T.C. Memo. 1988-71, 55 T.C.M. (CCH) 189, 190 (holding that taxpayer was

---

[12] Petitioner additionally argues that the additions to tax under section 6651(a)(1) and (2) should be abated under the first-time penalty abatement provided for in *Internal Revenue Manual* 20.1.1.3.6.1 (Aug. 5, 2014). We reject this argument because, as we have stated before, it "is a well-settled principle that the Internal Revenue Manual does not have the force of law, is not binding on the IRS, and confers no rights on taxpayers." *McGaughy v. Commissioner*, T.C. Memo. 2010-183, 100 T.C.M. (CCH) 144, 148; *see United States v. Caceres*, 440 U.S. 741, 750–51 (1979); *Fargo v. Commissioner*, 447 F.3d 706, 713 (9th Cir. 2006), *aff'g* T.C. Memo. 2004-13; *United States v. Horne*, 714 F.2d 206, 207 (1st Cir. 1983); *Frazier v. Commissioner*, T.C. Memo. 2024-3, at *157 n.72.

**[*19]** liable for additions to tax for fraud where taxpayer failed to file tax returns for certain years at issue but had previously filed individual and corporate tax returns for another year); *Cook v. Commissioner*, T.C. Memo. 1980-415, 40 T.C.M. (CCH) 1334, 1335 (same). Nor are we persuaded by petitioner's argument that there were no tax professionals in Chickaloon. Petitioner was not limited to finding a tax professional in or around Chickaloon. During her employment with Linc, petitioner routinely travelled 80 miles from her home in Chickaloon to Linc's office in Anchorage. We note that petitioner's attorney in this case is also based in Anchorage. There is no reason she could not have sought out a tax professional based in Anchorage when the issue originally arose in early 2015. Additionally, she could have consulted with a tax professional based outside Alaska through phone calls or email. The fact that petitioner resides in a remote location does not excuse her failure to seek out a tax professional to advise her on the issue, complex as it may have been. Finally, while we are sympathetic to petitioner's personal circumstances, they do not constitute reasonable cause for her failure to file a return. *See Johnson v. Commissioner*, T.C. Memo. 2002-239, 84 T.C.M. (CCH) 347, 351 (holding that taxpayer's unusual personal circumstances and excessive work for legal center did not constitute reasonable cause for failure to file her tax return).

The scope of the tax issue may not have been immediately clear to petitioner when she received her December 31, 2014, brokerage statement that showed that 100,000 shares of Linc Energy stock were deposited into her Charles Schwab account on December 3, 2014. However, when she received the Linc Form W–2 at the end of January 2015 showing the 100,000 shares as income to her, she should have sought the advice of a tax professional for how to file her return for the year at issue, rather than simply failing to file. After petitioner's attempted contacts to a Linc administrative employee and Linc Energy's company secretary to have the disputed shares rescinded proved unsuccessful, she should have recognized that there would be tax implications from the share transfer and sought professional advice on how to file the 2014 return. Additionally, although Mr. Feige does not have any background in tax preparation or accounting, and he has not taken any formal tax preparation education courses, we do not believe that his lack of knowledge excuses their failure to file a return for the year at issue. Petitioner and Mr. Feige's prior and consistent history of filing tax returns indicates that they were aware of their requirement to do so. *See Schramm*, 62 T.C.M. (CCH) at 1055; *Sine*, 55 T.C.M. (CCH) at 190; *Cook*, 40 T.C.M. (CCH) at 1335. We conclude that petitioner did not exercise ordinary business care and prudence. Accordingly,

[*20] petitioner is liable for the addition to tax for failure to timely file under section 6651(a)(1).

     B.    *Failure to Pay*

Section 6651(a)(2) imposes an addition to tax for failure to timely pay the amount shown as tax due on a return, unless the taxpayer proves that such failure is due to reasonable cause and not due to willful neglect. *El v. Commissioner*, 144 T.C. 140, 150 (2015). The addition to tax under section 6651(a)(2) is 0.5% of the amount of tax shown on such return if the failure does not exceed one month, with an additional 0.5% per month while the failure continues, up to a maximum of 25%.

Petitioner's 2014 transcript indicates that the IRS prepared an SFR as authorized by section 6020(b) for the tax year at issue. Respondent further asserts that the SFR was based on the Form W–2 that Linc issued to petitioner, Schedule K–1, Shareholder's Share of Income, Deductions, Credits, etc., for ordinary income of $288 from the Castle Mountain Group, Inc., and Form 1099–MISC for other income of $1,884 from the Alaska Permanent Fund Corp. The Notice based on the SFR informed petitioner that the amounts reported on these third-party reporting documents resulted in a tax liability for the year at issue.

To satisfy his burden of production for the addition to tax under section 6651(a)(2), the Commissioner must introduce evidence that an SFR meeting the requirements of section 6020(b) was made. *See Wheeler*, 127 T.C. at 210. The SFR constitutes the return for purposes of the addition to tax under section 6651(a)(2), and the amount of the taxpayer's liability for that addition to tax is determined on the basis of his failure to pay the tax shown on the SFR. § 6651(g)(2). We have addressed on several occasions what constitutes an SFR. *See Wheeler*, 127 T.C. at 208–10 (discussing *Phillips v. Commissioner*, 86 T.C. 433, 437–38 (1986), *aff'd*, 851 F.2d 1492 (D.C. Cir. 1988); *Millsap v. Commissioner*, 91 T.C. 926, 930 (1988); and *Cabirac*, 120 T.C. at 170–73). In *Phillips*, 86 T.C. at 437–38, we held that a "dummy return," i.e., page 1 of Form 1040, showing only the taxpayer's name, address, and Social Security number, was not a section 6020(b) return. In *Millsap*, 91 T.C. at 930, we held that unsubscribed Forms 1040 containing only the taxpayer's name, address, Social Security number, and filing status, but that attached subscribed revenue agent reports that had sufficient information to compute the taxpayer's tax liability, were valid SFRs under section 6020(b). In *Cabirac*, 120 T.C. at 170–73, we held that unsubscribed SFRs, showing zeroes on the relevant lines for computing

[*21] a tax liability and no tax liability, did not meet the requirements of section 6020(b).

In *Cabirac*, 120 T.C. at 172, the Commissioner asserted that a Notice of Proposed Adjustments which contained information as to how the taxpayer's tax liability was computed was in the record; however, the Commissioner did not introduce any evidence that the notice of proposed adjustments was attached to the SFRs. We distinguished *Millsap* from *Cabirac* because in *Millsap*, the revenue agent's report was attached to the SFR. *Cabirac*, 120 T.C. at 172. In *Rader* we summarized the requirements of a section 6020(b) SFR: "To constitute a section 6020(b) SFR, 'the return must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and the return form and any attachments must purport to be a 'return'." *Rader v. Commissioner*, 143 T.C. 376, 382 (2014) (quoting *Spurlock*, 85 T.C.M. (CCH) at 1244), *aff'd in part, appeal dismissed in part*, 616 F. App'x 391 (10th Cir. 2015).

While petitioner's 2014 transcript indicates that respondent prepared an SFR, respondent has not introduced into evidence a certified copy of the SFR for 2014. The Exhibits that were attached to the First Stipulation of Facts are (1) the Notice, (2) petitioner's Form W–2, (3) petitioner's late-filed 2014 tax return dated March 24, 2021, which she submitted to Appeals after this case was commenced, (4) petitioner's 2014 transcript, (5) petitioner's wage and income transcript for the 2014 tax year, and (6) copies of documents that petitioner relies on to show that she did not receive income from the disputed stock in the year at issue. The Second Stipulation of Facts does not attach any exhibits and includes several factual stipulations regarding the share transfer and petitioner's termination from Linc. The Third Stipulation of Facts does not attach any exhibits and contains several factual stipulations regarding the documents petitioner relies on to show that the value of the disputed shares was not income to her.

Our review of the record and the filings in this case demonstrates that respondent has not introduced any document into evidence that meets the requirements of an SFR. Because respondent has not met his burden of production by producing evidence of an SFR that meets the requirements of section 6020(b) for the year at issue, we will not sustain respondent's determination that petitioner is liable for an addition to tax under section 6651(a)(2). *See Gardner v. Commissioner*, T.C. Memo. 2013-67, at *24–25 (holding that the reference in an account transcript to a "substitute tax return prepared by IRS" was insufficient to satisfy

**[\*22]** the Commissioner's burden of production under section 7491(c) for the imposition of an addition to tax under section 6651(a)(2)), *aff'd*, 845 F.3d 971 (9th Cir. 2017).

C.     *Failure to Make Estimated Tax Payments*

Section 6654(a) imposes an addition to tax on an individual who underpays estimated tax. This addition to tax is calculated with reference to four required installment payments of the taxpayer's estimated tax liability. § 6654(c) and (d). Each required installment is equal to 25% of the "required annual payment." § 6654(d). Where a taxpayer has not filed a return for the current tax year or the immediately preceding tax year, the "required annual payment" is equal to 90% of the tax due for the current year. § 6654(d)(1)(B). If the taxpayer filed a return for the immediately preceding tax year, the required annual payment is 100% of the tax shown on that return.[13] *Id.*

The Commissioner's burden of production under section 7491(c) also requires him to produce, for each year for which the addition to tax is asserted, evidence that the taxpayer had a "required annual payment" under section 6654(d). To do so, the Commissioner must establish the tax shown on the taxpayer's return for the preceding year or demonstrate that the taxpayer filed no such return. *See Wheeler*, 127 T.C. at 212; *Harvey v. Commissioner*, T.C. Memo. 2023-95, at \*6–7; *Collins v. Commissioner*, T.C. Memo. 2020-50, at \*47.

Respondent did not include in the stipulations of facts, or as a proposed trial exhibit, a copy of petitioner's federal income tax return for 2013 or evidence that petitioner failed to file a return for 2013. No information regarding petitioner's 2013 tax year is included in the record of this case. Because respondent has not met his burden of production, we will not sustain his determination that petitioner is liable for an addition to tax under section 6654.

IV.    *Conclusion*

For the foregoing reasons, we hold that petitioner failed to file a return and include the value of the disputed shares as reported on her Form W–2 in income for the year at issue, and we will sustain the deficiency and the addition to tax under section 6651(a)(1). We have considered the parties' remaining arguments and, to the extent not

---

[13] If an individual's adjusted gross income shown on the previous year's return exceeds $150,000, a higher percentage may apply. *See* § 6654(d)(1)(C).

**[\*23]** discussed above, we conclude that they are irrelevant, moot, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent as to the deficiency and the addition to tax under section 6651(a)(1) and for petitioner as to the additions to tax under sections 6651(a)(2) and 6654.*